UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Winthrop Resources Corporation,

Plaintiff,

v.

Civ. No. 01-640 (JEL/JGL)
ORDER

Advanced Telecomm of Pittsburgh,
Advanced Telecomm, Inc.,
ATI Communications, Inc.,
Advanced Telecomm of Maryland, Inc.,
Bruce Reale, and Vincent A. Lo Castro,

Defendants.

---

Barbara P. Berens, Esq., and Erin K. Fogarty Lisle, Esq., Kelly & Berens, P.A., appeared for Plaintiff Winthrop Resources Corporation.

Gregory R. Merz, Esq., Gray, Plant, Mooty, Mooty & Bennett, P.A., appeared for Defendants Advanced Telecomm of Pittsburgh, Advanced Telecomm, Inc., ATI Communications, Inc., Advanced Telecomm of Maryland, Inc., Bruce Reale, and Vincent A. Lo Castro.

---

This case arises out of a lease agreement between a lessor of computer equipment, Winthrop Resources Corporation (Winthrop), and several related lessees, Advanced Telecomm of Pittsburgh, Advanced Telecomm, Inc., ATI Communications, Inc., and Advanced Telecomm of Maryland, Inc. (collectively, ATI). Winthrop brought suit against ATI and the guarantors of the lease agreement, Bruce Reale and Vincent A. Lo Castro (collectively, Guarantors), alleging that they failed to make lease payments and failed to return the equipment as required by the lease agreement. The matter comes before the Court on Winthrop's Motion for Summary Judgment and a Cross-Motion for Partial Summary Judgment by ATI and Guarantors. For the reasons given below, the Court grants Winthrop's motion in part and grants ATI and Guarantors' motion.

DEC 1 0 2002

RICHARD D. SLETTEN, CLERK DEC 1 0 2002
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS

## I. SUBJECT MATTER JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) (2000).

## II. BACKGROUND

Winthrop and ATI executed a lease agreement (Agreement) in January 1995. (Gendler Aff., Ex. 1.) Winthrop also entered lease guaranties with two of ATI's owners, Guarantors, in which they "unconditionally and absolutely agree[d]" to guaranty ATI's performance of the Agreement. (*Id.*, Exs. 12-13.)

The Agreement provided that the specific equipment to be leased, as well as certain terms and conditions related to the equipment, would be identified in lease schedules executed by Winthrop and ATI, and that the lease schedules would be incorporated by reference into the Agreement. (*Id.*, Ex. 1 at 1.) Three lease schedules executed by Winthrop and ATI are at issue in this case: lease schedule 001R (Schedule 1), lease schedule 002R (Schedule 2), and lease schedule 003R (Schedule 3). (*Id.*, Exs. 2-4.) All of the Schedules had an initial term of five years, with the term continuing from year to year thereafter until the lease was terminated. (*Id.*, Ex. 1 § 1; *Id.*, Exs. 2-4.) The initial term of Schedule 1 ran from September 1, 1995, to August 31, 2000; the initial term of Schedule 2 ran from November 1, 1995, to October 31, 2000; and the initial term of Schedule 3 ran from July 1, 1996, to June 30, 2001. (*Id.*, ¶¶ 6-8; *Id.*, Exs. 5-7.)

In a letter dated June 19, 2000, ATI notified Winthrop that it wished to terminate the Agreement with respect to Schedule 1 and Schedule 2. (*Id.*, Ex. 9.) Winthrop responded in a letter dated July 10, 2000, stating that the term for Schedule 1 would end on August 31, 2001, and that the term for Schedule 2 would end on October 31, 2000. (Merz. Aff., Ex. H.) Winthrop's letter also stated, "Return instructions will be sent to your attention in respect to this schedule at the appropriate time." (*Id.*)

ATI sent a second termination notice dated September 7, 2000, which stated: "[W]e will not be renewing any part of this lease. The equipment is not Y2K [compliant] and we cannot afford to pay for this system as well as our new system."[1] (Gendler Aff., Ex. 14.) Winthrop responded by letter dated September 8, 2000, informing ATI that the term for Schedule 1 had been extended to August 31, 2001, under the terms of the Agreement. (*Id.*, Ex. 10.)

ATI has not provided Winthrop with any lease payments related to Schedule 1 since August 2000 (*see id.* ¶¶ 15, 24(a)), related to Schedule 2 since October 2000 (*see id.* ¶¶ 15, 18, 24(b)), or related to Schedule 3 since June 2001 (*see id.* ¶¶ 15, 19, 24(c)). In other words, ATI stopped paying Winthrop when the Schedules' initial terms ended. Winthrop has not provided ATI with written instructions for the return of the equipment identified in Schedule 1 or Schedule 2. (Stinchfeld Dep. at 102-04; Wilson Aff. ¶ 10.) Winthrop did provide written return instructions for the equipment identified in Schedule 3, but the instructions did not set a time for return of the equipment. (Wilson Aff. ¶ 10; *Id.*, Ex. D.) To date, ATI has not returned any of the equipment to Winthrop. (Gendler Aff. ¶¶ 17-19.) ATI concedes that it "is unable to locate all of the equipment on all three of the lease schedules," but it maintains that it could acquire and return comparable equipment. (Wilson Aff. ¶ 11.)

Winthrop brought this action against ATI and Guarantors in April 2001, seeking damages, costs, and attorneys' fees for breach of contract, account stated, and conversion. (Supp. Comp. at Counts I-IV.) Winthrop also seeks a declaratory judgment that the Agreement and Schedules will remain in force "until such time as [they] are terminated properly and the leased equipment is returned." (*Id.* at Counts V-VII.)

---

[1] Because the equipment was not Y2K compliant, "the system date would not advance to '00'," and "the records maintained by the system would not reflect the accurate date after December 31, 1999." (Wilson Aff. ¶ 4.)

## III. DISCUSSION

### A. Standard of Decision

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, courts must view the evidence in the record and the inferences to be drawn from it in the light most favorable to the party opposing the motion. *See Matsushita*, 475 U.S. at 587.

### B. ATI's Termination of the Schedules

In support of its motion, Winthrop argues that ATI's written termination notices related to Schedule 1 were untimely because they were mailed less than 120 days before Schedule 1's initial term ended on August 31, 2000. As a result, Winthrop argues, Schedule 1 remained in effect for an additional year, until August 31, 2001. Winthrop relies on Section 1 of the Agreement, which provides in relevant part:

> The term of this Lease Agreement as to all Equipment designated on any particular Lease Schedule may be terminated without cause at the end of the Initial Term or any year thereafter by either party mailing written notice of its termination to the other party not less than one hundred twenty (120) days prior to such termination date.

Section 1 also contains what is known as an "evergreen clause," which provides that the lease term "shall continue from year to year" after the expiration of the initial term unless the lease is terminated by either party. Winthrop argues that these provisions are clear and unambiguous and must be enforced as written.

It is undisputed that the initial term for Schedule 1 ended on August 31, 2000. Thus, to comply with Section 1's 120-day notice requirement, ATI had to mail a written termination notice no later than May 3, 2000. It did not do so. ATI's earliest written termination notice is dated June 19, 2000, approximately six weeks after the notice period ended.

Nevertheless, ATI and Guarantors argue that there is a genuine issue of material fact regarding whether ATI terminated Schedule 1 at the end of its initial term. Citing conversations between representatives of Winthrop and ATI, they argue that Winthrop had "actual knowledge" of ATI's intent to terminate Schedule 1 at least 120 days before August 31, 2000. (*See* Wilson Aff. ¶ 7.) ATI and Guarantors' argument on this point cannot be squared with the language of Section 1, which calls for "*written* notice of termination." (Emphasis added.) Similarly, Section 26 of the Agreement states that "[a]ny notice provided for herein *shall be in writing*." (Emphasis added.) Based on the plain meaning of these contractual provisions, the Court concludes that ATI's unwritten communications cannot be considered in determining whether it complied with Section 1's 120-day notice requirement.

ATI and Guarantors also argue that there is a genuine issue of material fact as to whether ATI terminated all of the Schedules pursuant to the termination procedure set forth in Section 12 of the Agreement. Section 12 provides in relevant part:

> In the event that all or part of the Equipment shall, as a result of any cause whatsoever, become lost, stolen, destroyed or rendered irreparably unusable or damaged, as determined by [ATI], then [ATI] shall, within ten (10) days after it shall have made such determination, fully inform [Winthrop] in regard thereto and

> shall pay to [Winthrop] (1) the greater of (a) [Winthrop's] then applicable Unrecovered Investment in said Equipment as of the next succeeding rental payment date or (b) the insurable value of the Equipment as provided in Section 13 hereinbelow, and (2) all rentals and other sums past due or becoming due to and including such next succeeding rental payment date in respect of such Equipment. Upon payment of said amounts, the Lease Schedule shall terminate as to said Equipment.

According to ATI and Guarantors, this provision was triggered by ATI's September 7, 2000, letter to Winthrop, which stated: "The equipment is not Y2K [compliant] and we cannot afford to pay for this system as well as our new system." (Gendler Aff., Ex. 14.) ATI and Guarantors construe this letter as "fully inform[ing]" Winthrop that the equipment was "irreparably unusable."

The Court disagrees with ATI and Guarantors' argument on this point for two reasons. First, it is undisputed that ATI determined that the equipment it leased from Winthrop was not Y2K compliant at some point in 1999. (*See* Wilson Aff. ¶¶ 4-5.) Thus, assuming *arguendo* that ATI's determination in 1999 that the equipment was not Y2K compliant constitutes a determination that the equipment was "irreparably unusable," ATI's September 7, 2000, letter did not fully inform Winthrop of its determination "within ten (10) days," as required by Section 12. Second, ATI has failed to submit any evidence showing that it made the payment contemplated by Section 12. On this record, no rational trier of fact could find that ATI terminated the Schedules pursuant to Section 12.

The final argument advanced by ATI and Guarantors concerning the termination date of Schedule 1 is that the 120-day notice requirement and the evergreen clause set forth in Section 1 of the Agreement are unenforceable, and that the term for Schedule 1 therefore ended on August 31, 2000. This argument proceeds under three separate theories. First, ATI and Guarantors claim that Section 1 is a penalty provision. In support of their position, they rely on a number of

Minnesota cases that discuss the enforceability of liquidated damages clauses. A liquidated damages clause fixes the amount of damages to be recovered by one or either party in the event of a breach. *Schutt Realty Co. v. Mullowney*, 10 N.W.2d 273, 276 (Minn. 1943). Under Minnesota law, a liquidated damages clause is enforceable when (1) "the fixed amount is a reasonable forecast of just compensation for the harm caused by the breach," and (2) "the harm is incapable or very difficult of accurate estimation." *Bellboy Seafood Corp. v. Nathanson*, 410 N.W.2d 349, 352 (Minn. Ct. App. 1987) (citing *Gorco Constr. Co. v. Stein*, 99 N.W.2d 69, 74-75 (Minn. 1959)).

The Court is not persuaded that case law dealing with the enforceability of liquidated damages clauses can be applied to the contractual provisions at issue here. Section 1 does not fix an amount of damages to be paid in the event of a breach. In the absence of a fixed amount, it is impossible to determine whether "the fixed amount is a reasonable forecast of just compensation for the harm caused by the breach." Furthermore, whereas a liquidated damages clause applies only in the event of a breach, Section 1 merely sets forth the procedure for terminating the lease and provides that the term "shall continue from year to year" unless the lease is terminated. Thus, Section 1 does not impose *any* consequences for a breach.[2] Based on these considerations, the Court concludes that Section 1 of the Agreement is not an unenforceable penalty provision. *See Bruner Corp. v. Winthrop Resources Corp.*, No. 94-C-690, slip op. at 12 (E.D. Wis. Jan. 3, 1995) (rejecting lessee's argument that the evergreen clause in Winthrop's lease is an unenforceable penalty provision).

---

2 ATI and Guarantors characterize ATI's failure to provide a timely termination notice as a "breach" of the Agreement. However, because ATI did not have a duty to terminate Schedule 1 at the end of its initial term, its failure to do so was not a breach.

Second, ATI and Guarantors maintain that enforcement of Section 1 would result in an unlawful forfeiture. They rely on Restatement (Second) of Contracts § 229 (1981), which provides: "To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." As used in section 229, the term "forfeiture" refers "to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance on the expectation of that exchange." *Id.* cmt. b. The comments and illustrations appended to section 229 show that it applies only to disproportionate forfeitures caused by the nonoccurrence of a condition of an obligor's duty. *See id.*, cmt. a. (stating "the non-occurrence of a condition of the *obligor's duty* may result in forfeiture by the obligee") (emphasis added); *id.*, cmt. b., illus. 1-2 (providing examples involving nonoccurrence of condition of obligor's duty); *id.*, cmt. c., illus. 3-5 (same). For example, an insurance company's duty to afford coverage to an insured may be conditioned on the insured's providing notice of its loss within a certain period of time. Several courts have held that if the insurance company is not prejudiced by the insured's failure to give timely notice of its loss, the nonoccurrence of this condition can be excused and the insurance company can be required to perform its duty to provide coverage. *See, e.g.*, *Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 230 (Colo. 2001) (citing Restatement (Second) of Contracts § 229); *Roberts Oil Co. v. Transamerica Ins. Co.*, 833 P.2d 222, 230 (N.M. 1992) (same).

On the facts of this case, ATI is the "obligee" who has allegedly suffered a forfeiture and Winthrop is the "obligor." If Winthrop had a duty that was conditioned on ATI's compliance with Section 1's 120-day notice requirement, then section 229 might allow the Court to excuse ATI's failure to comply with Section 1 and require Winthrop to perform its duty. That is not,

however, what ATI and Guarantors seek. Instead, they ask the Court to excuse ATI's failure to comply with Section 1 *so that they may escape their own contractual duties*—specifically, their duty to make lease payments on Schedule 1 from September 1, 2000, through August 31, 2001. Section 229 of the Restatement cannot be used for this purpose.

Finally, ATI and Guarantors argue that this case falls within the holding of *Trollen v. City of Wabasha*, 287 N.W.2d 645 (Minn. 1979). *Trollen* involved a marina operator who leased a section of shoreline and shoreline water rights from the City of Wabasha for a five-year term. *Id.* at 646-47. The lessee had the right to extend the lease for five years by giving notice to the city at least six months before the end of the term. *Id.* When the lessee provided the city with notice of his intent to extend the lease only four months in advance, the city informed him that the notice was untimely and that the lease would not be extended. *Id.* at 647. The district court, exercising its equitable powers, concluded that the lessee's notice was sufficient to extend the lease. *Id.* The Minnesota Supreme Court affirmed, holding that equity will relieve a lessee's failure to provide timely notice of its intent to extend a lease when (1) it is the result of "mere neglect," rather than willful, voluntary, gross, or inexcusable neglect; (2) the delay is slight; (3) the loss to the lessor is small; and (4) failure to grant equitable relief "would result in such hardship to the [lessee] as to make it unconscionable to enforce literally the condition precedent of the lease." *Id.* (quoting *F.B. Fountain Co. v. Stein*, 118 A. 47, 49 (Conn. 1922)).

ATI and Guarantors are not eligible for the equitable relief allowed in *Trollen*. First, they have not offered an explanation for ATI's failure to give timely notice of its intent to terminate Schedule 1. As a result, it is difficult to determine whether it was the result of "mere neglect." This is in contrast with *Trollen*, where the record indicated that the lessee was "unaware of the timing" requirement, and that his "reasonable reliance on the past course of dealings between

himself and the city led him to neglect ascertaining his formal obligations under the lease." *Id.* at 647-48. Second, a holding in favor of ATI and Guarantors would result in more than a small loss for Winthrop; specifically, it would deprive Winthrop of lease payments in excess of $100,000. By contrast, extension of the lease in *Trollen* did not cause any pecuniary harm to the city. In fact, the court strongly implied that extending the lease would *benefit* the city:

> [T]he city [had not] entered negotiations with or an agreement with a different tenant. Furthermore, there was no evidence that a higher rental could have been obtained; indeed, the record indicates that the rental paid by Trollen [the lessee] was slightly higher than that paid for comparable marinas.

*Id.* at 648. Third, ATI and Guarantors have not established that literal enforcement of the notice provision would be unconscionable. The Court is mindful that all of the parties to the Agreement at issue are sophisticated corporate entities, and there has been no allegation that there was a substantial disparity in bargaining power between Winthrop and ATI. Furthermore, the hardship complained of in this case does not extend beyond the payment of damages, costs, and fees. These circumstances differ from those in *Trollen*, where the lease was between an individual and the City of Wabasha, and where the record demonstrated that failure to extend the lease would cause the lessee to discontinue his marina operation, lose a significant portion of his investment by either removing or disposing of his marina equipment in a "forced sale," and "forfeit the good will he ha[d] established over the years." *Id.*

In sum, the Court concludes that Section 1 of the Agreement must be enforced according to the plain meaning of its clear and unambiguous terms. Because ATI did not provide Winthrop with a written termination notice regarding Schedule 1 at least 120 days before its initial term ended on August 31, 2000, and because ATI did not terminate Schedule 1 pursuant to Section 12 of the Agreement, Schedule 1 was automatically extended for an additional year. Winthrop is therefore entitled to summary judgment insofar as it seeks to hold ATI and Guarantors liable for

their failure to make lease payments on Schedule 1 from September 1, 2000, through August 31, 2001. As for Schedule 2 and Schedule 3, there is no dispute that ATI provided timely notice of its intent to terminate them at the end of their initial terms. Schedule 2 and Schedule 3 therefore terminated on October 31, 2000, and June 30, 2001, respectively. It is undisputed that ATI made all required lease payments on Schedule 2 and Schedule 3 through their termination dates.

**C. ATI's Failure to Return the Equipment to Winthrop**

The next issue to be addressed is whether ATI and Guarantors' obligation to make lease payments extends beyond the Schedules' termination dates due to ATI's failure to return the equipment. The parties have cross-moved for summary judgment on this issue.

Section 7 of the Agreement governs ATI's duty to return the equipment to Winthrop:

> Upon the termination of this Lease Agreement as to the Equipment on any Lease Schedule, [ATI] shall prepare the Equipment for shipping, using the manufacturer's standard packing materials and will deliver and pay for such delivery of the Equipment to [Winthrop's] loading dock, Minneapolis, Minnesota, *at the time designated in writing by [Winthrop]*.

(Emphasis added.) ATI and Guarantors argue that ATI's duty to return the equipment is subject to the condition that Winthrop designate a time for return in writing, which Winthrop has not yet done. In response, Winthrop argues that the Agreement does not require it to provide written return instructions, and that, in any event, designating a time for return of the equipment would be futile because ATI is no longer in possession of all of the equipment.

Although the Agreement does not address whether Winthrop must issue a comprehensive set of written return instructions, Winthrop is "required by the terms of the Agreement to designate in writing a time for the return of the equipment." *Winthrop Resources Corp. v. N. Am. Lighting*, Civ. No. 01-551, 2002 WL 334410, at *5 (D. Minn. Feb. 12, 2002). Until it does so, ATI does not have a duty to return the equipment. As for Winthrop's futility argument, it is

undisputed that "ATI has, in storage, the mainframe and some of the [personal computers] and monitors that it leased from Winthrop," and that "if Winthrop would agree to accept return of the equipment, ATI could obtain and return comparable equipment, to the extent that it is unable to find the specific equipment listed on the lease schedules." (Wilson Aff. ¶ 11.) Based on these considerations, the Court concludes that ATI and Guarantors are entitled to summary judgment insofar as Winthrop's claims are based on ATI's failure to return the equipment. *See N. Am. Lighting*, 2002 WL 334410, at *5 (rejecting Winthrop's argument that lessee was liable beyond lease schedule's termination date based on its failure to return equipment when Winthrop had not designated a time for return of the equipment in writing).

**D. Costs and Attorneys' Fees**

Section 19 of the Agreement provides that, "in any event of any successful action . . . by reason of either party's breach" of the Agreement or Schedules, the "non-prevailing . . . will pay to the prevailing party its reasonable costs of collection or other out-of-pocket costs and expenses and reasonable attorneys' fees on account thereof." (Gendler Aff., Ex. 1 § 19). Similarly, Guarantors agreed to "reimburse [Winthrop] for all costs and expenses, including reasonable attorney's fees, incurred in the enforcement of the" lease guaranties or the Agreement. (*Id.*, Ex. 12 ¶ 7; *Id.*, Ex. 13 ¶ 7.) The Court concludes that Winthrop is entitled to its reasonable costs and attorneys' fees to the extent they are attributable to its successful claims related to Schedule 1.

## IV. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiff's Motion for Summary Judgment [Docket No. 21] is GRANTED in part and DENIED in part.

2. Defendants' Cross-Motion for Partial Summary Judgment [Docket No. 25] is GRANTED.

3. Defendants are jointly and severally liable to Plaintiff for the following amounts:

   a. $126,124.92, consisting of monthly lease charges and sales tax related to Schedule 1 for 12 months (September 2000 through August 2001), at $10,510.41 per month;

   b. late charges attributable to Defendants' failure to make payments on Schedule 1 from September 2000 through August 2001;

   c. property taxes attributable to the equipment identified on Schedule 1 from September 2000 through August 2001; and

   d. Plaintiff's reasonable costs and attorneys' fees to the extent they are attributable to its successful claims related to Schedule 1.

4. Within 30 days of the date of this Order, Plaintiff shall submit to the Court for its approval a calculation of the amounts in paragraph 3(b)-(d).

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: December 10, 2002

JOAN ERICKSEN LANCASTER
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov